565 P.2d 564

W. G. SLOVIACZEK and Sandra Sloviac-zek, Individually, W. G. Sloviaczek and Sandra Sloviaczek as Personal Repre-sentatives of the Estate of Michael D. Sloviaczek, the Estate of Michael D. Slo-viaczek, W. G. Sloviaczek and Sandra Sloviaczek as Personal Representatives of the Estate of Taunja Sloviaczek, the Estate of Taunja Sloviaczek, Plaintiffs-Appellants,

v.

The ESTATE of Dean Russell PUCKETT, Ada County Treasurer as Personal Rep-resentative of the Estate of Dean Russell Puckett, Daniel Puckett, Safeco Insur-ance Co. of America, Horace Mann Mutu-al Insurance Co., Defendants-Respon-dents.

No. 12111.

Supreme Court of Idaho.

June 6, 1977.

David L. Whitney, of Alexanderson, Da-vis, Rainey & Whitney, Caldwell, for plain-tiffs-appellants.

Phillip M. Barber, of Elam, Burke, Jep-pesen, Evans & Boyd, Boise, for respondent Safeco.

John P. Howard, of Quane, Smith, How-ard & Hull, Boise, for respondent Horace Mann.

DONALDSON, Justice.

The parties are in agreement as to the facts of the case. The appeal is brought by appellants, Mr. and Mrs. Sloviaczek, to recover damages for the wrongful deaths of their children. Those deaths occurred in a collision between an automobile owned by one B. H. Young in which those children were riding, and an uninsured automobile driven by an uninsured driver, Dean Russell Puckett. The Young automobile was insured by Safeco.

Three other insurance policies are in issue in this appeal. Safeco had issued a policy to Michael Sloviaczek, one of the deceased children, and Horace Mann Mutual Insurance Company had issued two policies to W. G. Sloviaczek. All of the policies, including the policy on the Young automobile, included uninsured motorist coverage in the minimum amount required by the Idaho Motor Vehicle Safety Responsibility Act—$10,000 per person or $20,000 per accident. The Sloviaczek children were included in the uninsured motorist coverage of all of the policies. All of the policies also included an identical "other insurance" proviso. In relevant part it reads as follows:

"Other insurance: with respect to bodily injury to an insured while occupying an automobile not owned by the named insured, the insurance under uninsured motorists shall apply only as excess insurance over any other similar insurance available to such insured and applicable to such automobile as primary insurance, *and this insurance shall then apply only in the amount by which the limit of liability for this coverage exceeds the applicable limit of liability of such other insurance.*" (emphasis added)

Safeco paid $20,000 to Mr. and Mrs. Sloviaczek under the uninsured motorist provision of Young's policy. Safeco also paid $2,783.24 under the medical and funeral expense provisions of the Young policy. The $20,000 was the maximum recovery allowed under the primary policy. It did not entirely compensate the Sloviaczeks for all of the actual damages they sustained as a result of the wrongful deaths of their children.

They brought this action seeking compensation to the extent of damages actually sustained under the uninsured motorist coverage of Michael Sloviaczek's Safeco policy and Mr. Sloviaczek's Horace Mann policies. They contend that the policies should be "stacked" with the result that the aggregate amount recovered under the four insurance policies could exceed the limits on any single policy and equal the amount of damages incurred. Respondent Safeco counterclaimed to have the medical and funeral expenses that it paid to the Sloviaczeks deducted against the $20,000 uninsured motorist coverage paid under Young's policy.

The District Court of the Fourth Judicial District denied both claims. Safeco does not appeal the lower court's refusal to offset medical and funeral expenses. The Sloviaczeks, however, appeal the court's refusal to allow recovery in excess of the $20,000 maximum provided by the Young insurance policy.

In order to prevail on their appeal, the Sloviaczeks must establish an independent legal basis for disregarding the "other insurance" provisions of the three insurance policies on which they seek recovery. They urge that Idaho should join the growing number of jurisdictions which when faced with the problem of reconciling conflicting "other insurance" clauses have adopted the *Lamb-Weston* doctrine. That doctrine holds that conflicting "other insurance" clauses are mutually repugnant and should be rejected in toto. It had its genesis in *Oregon Auto Ins. Co. v. United States Fidelity and Guaranty,* 195 F.2d 958 (9th Cir. 1952). It was amplified and adopted by the Oregon Supreme Court in *Lamb-Weston, Inc. v. Oregon Auto. Ins. Co.,* 219 Or. 110, 341 P.2d 110 (1952) from which it derives its name. Since then it has been accepted by an impressive number of courts. *Globe Indem. Co. v. Capital Ins. & Sur. Co.,* 352 F.2d 236 (9th Cir. 1965) (Guam); *Allstate Ins. Co. v. American Underwriters, Inc.,* 312 F.Supp. 1386 (N.D.Ind.1970); *Vance Trucking Co. v. Canal Ins. Co.,* 251 F.Supp. 93 (D.S.C.1966), aff'd 395 F.2d 391 (4th Cir.), cert. denied,

393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968); *Continental Cas. Co. v. St. Paul Mercury Fire & Marine Ins. Co.*, 163 F.Supp. 325 (S.D.Fla.1958); *Woodrich Constr. Co. v. Indemnity Ins. Co.*, 252 Minn. 86, 89 N.W.2d 412 (1958); *Arditi v. Massachusetts Bonding and Ins. Co.*, 315 S.W.2d 736 (Mo.1958); *Curran v. State Auto. Mut. Ins. Co.*, 25 Ohio St.2d 33, 266 N.E.2d 566 (1971) (alternative holding); *Sparling v. Allstate Ins. Co.*, 249 Or. 471, 439 P.2d 616 (1968); *Liberty Mut. Ins. Co. v. Truck Ins. Exch.*, 245 Or. 30, 420 P.2d 66 (1966); *Firemen's Ins. Co. v. St. Paul Fire and Marine Ins. Co.*, 243 Or. 10, 411 P.2d 271 (1966). We find the reasoning underlying the Lamb-Weston doctrine persuasive. We adopt it as the law of Idaho.

"Other insurance" clauses had their origin in property insurance policies. Their purpose was to discourage overinsurance and its presumed inducement of fraudulent recoveries. When insurance companies began to issue automobile liability policies, they included "other insurance" provisions as standard clauses in those policies as well, even though the possibility of overinsurance inducing contrived recoveries was remote. Initially their application was limited. Competition among automobile insurers, however, expanded insurance coverage beyond an insured's own automobile and person. Omnibus provisions that covered a named insured as well as anyone in his household and drive-other-car provisions that extend the coverage beyond the named insured's automobile became common in most insurance policies. This proliferation of coverages caused numerous situations to arise wherein a particular loss would have been covered by more than one insurance policy were it not for the "other insurance" clauses which were also standard items in most insurance policies.

"Other insurance" clauses fall into three general categories—pro rata, excess and escape.[1] Pro rata clauses provide that the insurer will pay its pro rata share of the loss, usually in the proportion which the limits of its policy bears to the aggregate limits of all valid and collectible insurance. Excess clauses provide that the insurer's liability shall be only the amount by which the loss exceeds the coverage of all other valid and collectible insurance, up to the limits of the excess policy. Escape clauses provide that the policy affords no coverage at all when there is other valid and collectible insurance. The effect of each in the event of concurrent coverage is to reduce the insurer's loss.

In cases of concurrent coverage, the problem becomes one of allocating the loss among the respective insurers. The cardinal rule in automobile liability insurance cases is that, regardless of the method of apportionment used, the insured should not receive less coverage than if he were protected by only one of the policies in question. Aside from this universally accepted principle, however, there has been little agreement among the courts. Many cases have reached opposite results under identical factual situations. Because of the disparate language of "other insurance" clauses, moreover, factual variations are legion. This has stimulated a great deal of litigation with accompanying divergent and irreconcilable results.

Prior to *Lamb-Weston* three general theories had been used by the courts in apportioning the loss—the prior in time, specific versus general, and primary tort feasor theories. The prior in time theory, a carryover from property insurance cases, looks to the effective date of each policy and finds the one with the earliest date primarily liable for the loss. The specific versus the general theory assigns primary liability on the basis of the relative specificity of the policies—the insurer whose policy provides the most specific protection against the loss covers it. The primary tort feasor theory places the burden of primary liability upon the insurer whose named insured is the primary tort feasor; the other insurer, under whose policy the primary tort feasor is an additional insured, is liable only for the excess of the loss over the limits of the first insurer's policy.

---

1. Combinations of the three are also found.

All of these theories have one characteristic in common—their application arbitrarily imposes liability on one of the insurers. A circularity problem is usually created when there is more than one "other insurance" clause.[2] Each clause refers to and operates upon the availability of "other insurance." Which insurance policy should bear primary liability is a conundrum that courts have tried to solve by applying various artificial theories, none of which are very persuasive. The Court of Appeals of the Ninth Circuit said it well in *Oregon Auto Ins. Co. v. United States Fidelity and Guaranty Co., supra.*

"We have examined cases in other jurisdictions cited by counsel where closely similar or substantially identical disputes between insurance companies have arisen. These decisions point in all directions. One group indicates that the policy using the word 'excess' is secondary and that containing the language of the Oregon policy is primary. * * * Their reasoning to us is completely circular, depending, as it were, on which policy one happens to read first. Other cases seem to recognize the truth of the matter, namely, that the problem is little different from that involved in deciding which came first, the hen or the egg. In this dilemma courts have seized upon some relatively arbitrary circumstance to decide which insurer must assume primary responsibility. Thus one group of cases fixes primary liability on the policy which is prior in date. Another group undertakes to decide which policy is the more specific, holding the one thought more specific to be primary. Another solution is represented by *Maryland Casualty Co. v. Bankers' Indemnity Insurance Co.,* 51 Ohio App. 323, 200 N.E. 849, where it was held that the policy issued to the person primarily liable for the damage is the primary insurance. In sum, the cases are irreconcilable in respect both of approach and result." 195 F.2d at 959–960.

*Oregon Auto Ins. Co.* involved "other insurance" clauses of the pro rata excess and pro rata escape variety. Since the two clauses were found to be indistinguishable in meaning and intent, the court would not distinguish between them. Noting that under traditional insurance law, if neither insurance policy contained an "other insurance" clause, the loss would have been prorated in proportion to the amount of insurance provided by the respective policies, the court concluded that the same result should inhere when "other insurance" clauses *were* contained in the policies. The court held that the "other insurance" clauses there involved were mutually repugnant and should be disregarded.

In *Lamb-Weston*, the Oregon Supreme Court extended this holding to all "other insurance clauses." "Any attempt to give effect to the 'other insurance' provision of one policy while rejecting it in another [was] like pursuing the will o' the wisp." 341 P.2d at 115–116. All conflicting "other insurance" clauses were mutually repugnant and should be rejected in their entirety. In the words of the Oregon Supreme Court,

"The 'other insurance' clauses of all policies are but methods used by insurers to limit their liability, whether using language that relieves them from all liability (usually referred to as an 'escape clause') or that used by St. Paul [Ins. Co.] (usually referred to as an 'excess clause') or that used by Oregon [Ins. Co.] (usually referred to as a 'prorata clause'). In our opinion, whether one policy uses one clause or another, when any come in conflict with the 'other insurance' clause of another insurer, regardless of the nature of the clause, they are in fact repugnant and each should be rejected in toto." 341 P.2d at 119.

All of the cases adopting *Lamb-Weston* operate from the same premise. In cases of concurrent coverage, the circularity of the

---

**2.** The only time a circularity problem does not exist is when all the other insurance clauses are of the pro rata type. There being no conflict among them, they would operate unimpeded by *Lamb-Weston*.

interaction of the respective policies, each claiming that the other must pay first, creates a repugnancy. We hold that *Lamb-Weston* should apply in all cases where conflicting "other insurance" clauses of the excess, pro rata or escape types are found. When "other insurance" clauses conflict, they must be disregarded.

■ The "*other insurance clauses*" in the present case are all of the excess type. Each defers to another. If interpreted literally, they would result in no coverage at all. We find them mutually repugnant and disregard them in toto. The district court implied that it would have adopted the *Lamb-Weston* doctrine were it not for this Court's holding in *Viani v. Aetna Ins. Co.*, 95 Idaho 22, 501 P.2d 706 (1972). The facts of the *Viani* case are distinguishable, but we do not choose to base the result reached in this case on this factor. We hold that *Lamb-Weston* is the better rule of law. To the extent that the Court's holding in *Viani* is inconsistent with *Lamb-Weston,* it is overruled.

In *Oregon Auto Ins. Co.* and *Lamb-Weston* the loss was less than the policy limits of both insurance policies. Since the other insurance clauses were disallowed, the loss was prorated in proportion to the amount of insurance provided by the respective policies. The case at bar involves a loss that equals or exceeds the aggregate limits of all four insurance policies involved in the case. We have already held that the "other insurance" clauses contained in the Safeco policies and the Horace Mann policies are mutually repugnant and should be disregarded. The question then becomes whether we should allow the Sloviaczeks to stack the respective policies to effect a recovery equal to their loss.

■ The same question was raised in *Smith v. Pacific Auto Ins. Co.,* 240 Or. 167, 400 P.2d 512 (1965) and *Werley v. United Services Automobile Association,* 498 P.2d 112 (Alas.1972). Both courts specifically rejected the insurer's argument that the plaintiff should not be permitted to stack benefits under several policies. We likewise. The effect of the *Lamb-Weston* doc-

trine is to disallow conflicting "other insurance" clauses. Upon disallowance a plaintiff is effectively covered by more than one insurance policy. He is therefore entitled to recover an amount equal to his loss up to the combined limits of all of the policies. In the event his losses are less than the combined limits of all the policies, they should be allocated pro rata in proportion to the amount of insurance provided by the respective policies.

We do not find injustice in this result. In a case such as this, all of the companies will have collected premiums for their coverage; they should therefore bear the concomitant responsibility. We are aware that insurance rates are adjusted according to the amount of coverage requested and the anticipated liability. It may be that the premium rates currently in effect were based partially on the premise that "other insurance" clauses would continue to be viable in Idaho. The issuance of an insurance policy is always a risk taking venture. Calculation of the premium to be charged for that risk is a matter within the special competence of insurance companies.

Judgment reversed and remanded for further proceedings. Costs to appellants.

SHEPARD, BAKES and BISTLINE, JJ., concur.

McFADDEN, Chief Justice, dissenting.

I am reminded in this matter of the Greek legend concerning the Gordian Knot. The knot, tied by King Gordius of Phrygia, was said to be so complex that it could not be undone. The oracles told that only he who would be master of Asia could undo the Gordian Knot. Many tried to untie it and failed. Alexander the Great, however, took one look and then cleaved the knot in half with his sword. This is not different from the approach taken by the majority opinion; faced with a problem of untangling insurance policy provisions, the majority has chosen to disregard the contract provisions of the policies and substitute a result totally unrelated to them. While such an approach to problem solving may

lead to greatness in the executive or even the legislative branch of government, it is inappropriate in the judiciary.

The thrust of the majority opinion is the adoption of the *Lamb-Weston* doctrine. This doctrine lacks basis, both legal and rational, and should be rejected in Idaho. The correct interpretation of the insurance provisions involved here, giving due consideration to the intent of the parties, the policy provisions and the case law of the State does not allow the policies to be "stacked."

Two comments should be made in preface. I would first clarify the record as to the present posture of this particular rule of law. The majority opinion cites a lengthy string of cases championing the doctrine. Let it not be inferred, however, that the so-called *"Lamb-Weston"* doctrine is particularly a majority rule. On the contrary, the authority is widely divided. See, Annot., 28 A.L.R.3d 551 (1969), and cases cited therein.

The position that "other insurance" clauses are valid and that policies do not stack is well supported in case law. *McCarthy v. Preferred Risk Mut. Ins. Co.,* 454 F.2d 393 (9th Cir. 1972); *Transportation Insurance Co. v. Wade,* 106 Ariz. 269, 475 P.2d 253 (1970); *Martin v. Christensen,* 22 Utah 2d 415, 454 P.2d 294 (1969); *M.F.A. Mut. Ins. Co. v. Wallace,* 245 Ark. 230, 431 S.W.2d 742 (1968); *State Farm Mut. Auto. Ins. Co. v. Bafus,* 77 Wash.2d 720, 466 P.2d 159 (1970); *Maryland Cas. Co. v. Howe,* 106 N.H. 422, 213 A.2d 420 (N.H.1965); *Tindall v. Farmers Auto Manag. Corp.,* 83 Ill.App.2d 165, 226 N.E.2d 397 (1967); *Burcham v. Farmers Ins. Exchange,* 255 Iowa 69, 121 N.W.2d 500 (1963); *Sammons v. Nationwide Mut. Ins. Co.,* 267 A.2d 608 (Del.Super.1970); *Alliance Mut. Cas. Co. v. Duerson,* 184 Colo. 117, 518 P.2d 1177 (1974); *Nelson v. Employers Mut. Cas. Co.,* 63 Wis.2d 558, 217 N.W.2d 670 (1974); *Ray v. State Farm Mut. Auto. Ins. Co.,* 498 F.2d 220 (6th Cir. 1974); *Darrah v. Cal. State Auto. Assoc.,* 259 Cal.App.2d 243, 66 Cal.Rptr. 374 (1968). We cannot be persuaded to adopt the *"Lamb-Weston"* rule based upon a predominance of authority,

because there is relatively little agreement on the subject.

Secondly, the court should remember that a well established policy guides this decision from the outset. That is the rule that we must, if possible, give the language of each policy its intended effect. *Viani v. Aetna Ins. Co.,* 95 Idaho 22, 501 P.2d 706 (1972); *Zurich Gen. Acc. & Liab. Ins. Co. v. Clamor,* 124 F.2d 717 (7th Cir. 1941); *American Surety Co. v. Canal Ins. Co.,* 258 F.2d 934 (4th Cir. 1958). See, Watson, the "other Insurance" Dilemma, 16 Federation Ins. Counsel Q. 47 (1966); Comment, "Other Insurance" Clauses: The Lamb-Weston Doctrine, 47 Ore.L.Rev. (1968); Annot., 76 A.L.R.2d 502; *Weemhoff v. Cincinnati Ins. Co.,* 41 Ohio St.2d 231, 325 N.E.2d 239 (1975). Effect can be given to the policies, and it is the obligation of this court to do so.

I would then turn to the *Lamb-Weston* doctrine itself. The thesis underlying the doctrine seems to be that an abundance of "other insurance" clauses results in a circle of denial, which is in some manner "'repugnant." This repugnancy is then invoked as the basis for rejecting *all* of the provisions, with the result that all policies become available for satisfaction of damages. When damages exceed the limits of one policy, the policies may be "stacked" to reach the total of the damage.

First, I am mystified by the majority's belief that there is a "repugnancy" which forms a basis for rejecting the contract provisions. It is only the illogic of circularity which yields the so-called repugnancy. It is not denied by the majority or the parties that the "other insurance" provisions were agreed upon by the parties; there is no allegation of fraud or deceit, or any contention of unequal bargaining power resulting in unconscionability.

This circularity is not repugnant. It is true that if all provisions are taken together, all compensation would be denied. If so interpreted, the result might be repugnant. However, neither of the insurance companies party to the suit contend that such an interpretation should be given to the various provisions. In fact, one insurer, under

one of the policies, has already tendered policy limit payment, thus assuming singularly the obligation for compensation. Thus, there is no possibility of total denial of payment presented by this case.

Further, it is not necessary that we determine how the provisions are to be reconciled, as the parties have done so themselves here. (As the majority opinion notes, three different methods of allocating responsibility have been variously followed by courts around the nation. A reading of this court's decision in *Viani, supra,* might suggest the appropriate method in Idaho.) And when this court is ultimately faced with that decision, I perceive no insoluble difficulty in assessing liability. It may be true that any one of the three alternatives chosen for breaking the circle of "other insurance" clauses would be arbitrary and not based on a clearly dominant legal or logical justification. However, a clear, nonarbitrary basis is not needed. The whole rationale underlying the requirement of uninsured motorist provisions by I.C. § 41–2502 is that liability assigned to an insolvent, uninsured tortfeasor is worthless and that some arbitrary method of providing compensation is necessary. There is no repugnancy in arbitrarily selecting one insurer over the other for payment; so long as the rule is chosen and uniformly invoked the risk can be allocated actuarily by the insurance companies. At any rate this court cannot shy from a decision merely because there is no clear cut answer. In child custody disputes, for instance, courts are often faced with parents of equal vice or virtue. That there is not one or the other of the parents who should clearly win does not mean that we throw the child away and declare both losers. Similarly, we can resolve the difficulty of circular "other insurance" provisions without totally disregarding all such provisions. There is nothing repugnant in such an approach, and certainly this court cannot justify appellate court disregard for a valid contract by labeling the provisions of these contracts "repugnant."

Several of the cases cited in the majority opinion hold that "other insurance" provisions are contrary to public policy. I would make it clear that no public policy violation stems from the existence and enforcement of the provisions. "Public policy" is not something that a court can, by some feat of prestidigitation, conjure up from thin air. That magic is left to the legislature and we may defeat a contract provision limiting insurance coverage only if it violates a policy clearly set forth by the legislature. Here, no such legislative policy is apparent. A singular statute relates to the policy of insurance coverage for uninsured motorists. I.C. § 41–2502 provides:

> "Uninsured motorist coverage for automobile insurance.—No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any natural person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death as set forth in section 49–1505, Idaho Code, as amended from time to time, under provisions approved by the director of the department of insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided, however, that the named insured shall have the right to reject such coverage, which rejection must be in writing; and provided further, such coverage need not be provided in or supplemental to a renewal policy where the named insured had rejected the coverage in connection with a policy previously issued to him by the same insurer."

A policy requiring rejection of "other insurance" clauses is not reflected in the Idaho Statute. The Illinois Court discussed a similar statute in *Putnam v. New Amsterdam Cas. Co.,* 48 Ill.2d 71, 269 N.E.2d 97, 104 (1970):

"The question of public policy, it seems to us, is largely manufactured. Construing an insurance contract accurately and giving it the effect which its language clearly commands, is not *ipso facto* a breach of public policy merely because it disappoints the innocent victim of an uninsured motorist. * * * While there is some split in authority, the courts have generally reasoned that the legislature's intent in requiring such insurance is satisfied by coverage which assures that the insured will fare equally well whether the tortfeasor is insured or not."

The policy which *was* intended by the legislature was articulated by that court in *Tindall v. Farmers Automobile Man. Corp.,* 83 Ill.App.2d 165, 226 N.E.2d 397, 398 (1967):

"By adopting legislation concerning the financial responsibility of motorists the legislature has shown its concern for the economic hardships arising from damages caused by financially irresponsible motorist. Chap. 7 of Chap. 95½ Ill.Rev.Stat. (1965) (Financial Responsibility Act), requires that after a motor vehicle mishap has occurred the parties involved must show some degree of financial responsibility such as liability insurance in the minimum amounts of $10/$20,000.00. Failure to meet the minimum financial responsibility requirement results in loss or suspension of operating or ownership privileges. Thus it can be seen that there are certain areas or gaps the results of which would impose serious financial hardship on innocent victims of automobile collisions. To protect persons from the risks and hazards beyond the scope of the financial responsibility act, uninsured motorist protection has developed, indemnifying against loss or damage caused by an uninsured motorist. Paragraph 755a (Sec. 143a) of Chap. 73, Ill.Rev.Stat. (Ill. Ins.Code), requires that liability insurance policies include uninsured motorist protection unless such coverage is rejected by the insured, the minimum limits of such coverage being as established by the financial responsibility act. Such provision is designed to promote and encourage protection complementary to that afforded by the financial responsibility act, thereby affording coverage to the same extent as would have been in effect if the tort feasor had complied with the minimum requirements of the financial responsibility act. *Chandler v. Government Employees Insurance Company,* 5 Cir., 342 F.2d 420; *Maryland Casualty Company v. Howe,* 106 N.H. 422, 213 A.2d 420 and *Garcia v. Motor Vehicle Accident Indem. Corp.,* 18 A.D.2d 62, 238 N.Y.S.2d 195."

Given, then, that the intent of the legislature was to guarantee that a victim injured by an uninsured motorist would be protected to the same extent as a victim injured by an insured motorist, it becomes palpably unjust to construe the statute to mean that a victim of an uninsured may collect from as many uninsured motorist policies as happen to be applicable. As one commentator has criticized:

"No thought has been given to the fact that the act was intended merely to fill, not overflow, an insurance vacuum. Surely the General Assembly did not intend to foster a scheme whereby the innocent victim of an *insured* motorist may be penalized." Denny, Uninsured Motorist Coverage, 52 Va.L.Rev. 538 (1966).

The victim of an insured motorist with state-prescribed minimum liability coverage always will collect only that minimum amount. However, if the victim is injured by an uninsured motorist, the potential recovery blossoms upward with the number of policies applicable; in the instant case, four policies were available and plaintiffs would be entitled to coverage four times as great as if the tortfeasor had been insured. Not only is this contrary to the obvious intent of the legislature in requiring uninsured motorist coverage, but it is patently offensive to a reasoned sense of justice.

The majority opinion comments that

"We do not find injustice in this result. In a case such as this, all of the companies will have collected premiums for their efforts; they should therefore bear

the concomitant responsibility. We are aware that insurance rates are adjusted according to the amount of coverage requested and the anticipated liability. It may be that the premium rates currently in effect were based partially on the premise that 'other insurance' clauses would continue to be viable in Idaho. The issuance of an insurance policy is always a risk taking venture. Calculation of the premium to be charged for that risk is a matter within the special competence of insurance companies."

Surely by this excuse the majority opinion *does* recognize the injustice of its result. It is reasonable to assume that the premiums collected by each company were calculated actuarily based upon the assumption that policy payments would not be stacked. Thus, all companies *did not* collect amounts adequate to fairly compensate them for stacking of policies. There is no windfall profit for the insurance companies if policies are not stacked. The majority is correct in observing that the current premiums assume the validity of the "other insurance" clauses, and the result is that when the clauses are invalidated, premiums must rise for all policyholders, to maintain the actuarial soundness of the premium structure. The result of this opinion is that a motorist involved in an accident with an uninsured motorist whose negligence caused the accident will receive benefits in excess of those that would have been paid if the negligent motorist had been insured. Sadly, the brunt of this overpayment will be borne by all policyholders, in the form of increased premiums.

Ultimately, I believe that the policy provisions were agreed upon by the parties and should be honored if possible. It is possible to reasonably construe the provisions to give them the intended effect, and there is a total dearth of reason to do otherwise. No repugnancy and no violation of public policy is apparent. The result reached by the majority opinion is anomalous in the extreme. The provisions should be given effect and stacking of policies should not be allowed.