879 P.2d 1111

**STATE of Idaho, Plaintiff–Respondent,**

**and**

**Idaho State University, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, Defendant–Appellant.**

**CONTINENTAL CASUALTY COMPANY, Third Party Plaintiff–Appellant,**

v.

**COMPASS INSURANCE COMPANY, Third Party Defendant.**

No. 20666.

Supreme Court of Idaho, Boise, May 1994.

Aug. 22, 1994.

Hall, Farley, Oberrecht and Blanton, Boise, for appellant/third party plaintiff-appellant. Michael P. Tone argued.

Larry EchoHawk, Idaho Atty. Gen., Cosho, Humphrey, Greener & Welsh, Boise, for respondent. Howard Humphrey argued.

SILAK, Justice.

This case involves a dispute over insurance coverage. After the State of Idaho paid $375,000 to settle a claim brought against Idaho State University (ISU), the State sought payment of insurance proceeds from Continental Casualty Company (Continental), which had issued ISU a liability policy covering the University against losses incurred as a result of lawsuits. When Continental refused to pay the State's demand, the State filed a declaratory judgment action to recover the insurance proceeds. Continental filed a third party claim against Compass Insurance Company, which had paid the State $150,000 to cover losses incurred in the lawsuit against the University, under a liability

policy issued to the State. Continental contended that if the State was allowed to recover from Continental, Continental should be entitled to recover against Compass under the theory of equitable subrogation. After the State and Continental filed cross-motions for summary judgment, the district court denied Continental's motion, dismissed Compass from the lawsuit, and granted summary judgment to the State. Continental appeals from the district court's order of summary judgment.

## FACTS AND PROCEDURAL BACKGROUND

This is the second time this case has reached this Court for decision. The facts leading up to the Court's first decision, *State v. Continental Cas. Co.*, 121 Idaho 938, 829 P.2d 528 (1992) (*Continental I*), are stated succinctly in that opinion:

In this insurance coverage dispute the State of Idaho brought this action against Continental Casualty Company seeking declaratory relief and a money judgment for coverage under the terms of a Board of Education liability (BEL) insurance policy issued to Idaho State University (ISU) for the year 1981. In its action, the State of Idaho, for itself and on behalf of Idaho State University (ISU) seeks recovery for payments made by the Bureau of Risk Management (BRM) in defending and settling employment discharge, tort and civil rights claims in *Hale v. Walsh*, 113 Idaho 759, 747 P.2d 1288 (Ct.App.1987).

At the time in question, Compass Insurance Company (Compass) also provided insurance coverage to ISU and the State of Idaho. Compass paid BRM $150,000.00 for a policy holder's release with respect to the *Hale* claim, and BRM used a portion of these funds to reimburse ISU for defense costs it had incurred. Compass was joined in this action as a third party defendant by Continental which claimed Compass had paid less than its share of the *Hale* claim.

Continental, BRM and ISU all filed motions for summary judgment. The trial court denied Continental's motion in its entirety and granted summary judgment

in favor of BRM and ISU. In addition, on its own motion, the trial court entered summary judgment in favor of Compass because it viewed Continental's action against Compass as being moot. *Continental I*, 121 Idaho at 938–39, 829 P.2d at 528–29. In *Continental I*, we held that the State could not recover on the insurance contract against Continental because only ISU was named as an insured in the Continental policy, and neither the State nor the Bureau of Risk Management (BRM) were the same legal entity as ISU. The Court further held that ISU could not recover in its own name under the Continental policy because the policy required Continental to pay only for a "covered loss," and ISU never suffered a covered loss because BRM, not ISU, paid the liability on the Hale lawsuit. Accordingly, we reversed the district court's order of summary judgment and remanded the case for further proceedings.

On remand, the district court granted the State's motion to amend its complaint to allege claims for equitable subrogation and indemnity. The State and Continental then filed cross-motions for summary judgment. Following this Court's decision in *Continental I*, ISU was dismissed as a party to the action. In its Memorandum Decision on remand, the district court concluded that the State, having satisfied ISU's liability, stood in the shoes of ISU and was entitled to recover the defense and settlement costs from Continental under the doctrine of equitable subrogation. The district court entered judgment in favor of the State against Continental for $746,592.16 as covered losses in the Hale lawsuit. The district court also awarded the State its costs and attorney fees in this action against Continental. Continental has appealed from this Memorandum Decision and Summary Judgment.

## ISSUES ON APPEAL

Continental's appeal raises four issues for us to decide:

1. Whether the State is entitled to reimbursement from Continental under the principle of equitable subrogation.

2. Whether the State acted as ISU's insurer in paying the Hale settlement, which would allow Continental to avoid liability under the "other insurance" provision of Continental's policy.

3. Whether, assuming Continental is required to reimburse the State, Continental is entitled to a set-off for the $150,000 which Compass already paid the State under its general liability policy.

4. Whether the trial court erred in granting summary judgment to Compass.

## ANALYSIS

1. *Whether the State is Entitled to Payment from Continental Under the Principle of Equitable Subrogation.*

This Court has previously stated the following with respect to the doctrine of equitable subrogation:

"Generally speaking, it is only in cases where one advances money to pay the debt of another to protect his own rights that a court of equity substitutes him in place of the creditor as a matter of course, without any express agreement to that effect. The doctrine of subrogation is not administered as a legal right, but the principle is applied to subserve the ends of justice and to do equity. It does not rest on contract, and no general rule can be laid down which will afford a test in all cases for its application, and whether the doctrine is applicable to any particular case depends upon the peculiar facts and circumstances of such case."

*Chenery v. Agri–Lines Corp.*, 115 Idaho 281, 285, 766 P.2d 751, 755 (1988) (quoting *Houghtelin v. Diehl*, 47 Idaho 636, 639–40, 277 P. 699, 700 (1929)). "For the right of subrogation to arise, it is first essential that the party making a payment to a third person is under an obligation to make such a payment or has a recognizable interest to protect." *Chenery*, 115 Idaho at 285, 766 P.2d at 755 (quoting *Williams v. Johnston*, 92 Idaho 292, 442 P.2d 178 (1968)).

"A person voluntarily satisfying the debt or default of another can claim no right of subrogation, but it is apparently sufficient if there is practical compulsion to pay, although there may be no strict legal obligation to do so, or if, because of mistake,

the payor believes that it is his legal duty to pay."

*Chenery,* 115 Idaho at 286, 766 P.2d at 756 (quoting 83 C.J.S. § 16 SUBROGATION, at 617–18).

Continental argued to the district court that the State voluntarily paid the debt of ISU, without any legal obligation or practical compulsion to do so, and therefore the State is not entitled to equitable subrogation. The district court concluded, to the contrary, that the State did not pay ISU's debt to the Hales as a mere volunteer, but in order to protect the State's assets in the State General Fund. We agree.

Under I.C. § 6–922, ISU would have looked to the State for money to satisfy any portion of its liability which arose under the Idaho Tort Claims Act (ITCA), and which was not covered by insurance. This statute states:

> **6–922. Payment by state of claims or judgments when no insurance.**—In the event no insurance has been procured by the state to pay a claim or judgment arising under the provisions of this act, the claim or judgment shall be paid from the next appropriation of the state instrumentality whose tortious conduct gave rise to the claim.

Thus, that portion of ISU's liability to the Hales which arose under the ITCA, and for which there was no available insurance, would have been paid from the next appropriation of state funds to ISU. Before the State paid the Hales $375,000 to settle the lawsuit, Continental had refused to cover ISU for any amount more than $130,000. The $150,000 paid by Compass barely covered ISU's defense costs. Thus, at the time the State paid the Hales to settle the lawsuit, it was reasonable for the State to believe that ISU's liability to the Hales arose under the provisions of the ITCA, that the liability would exceed the amount of available insurance, and therefore ISU would have to request additional money in its next appropriation from the State to satisfy its liability to the Hales. At the same time, the amount of ISU's liability to the Hales was increasing at an interest rate of 18% per year. The district court properly concluded:

[H]ad the State not paid the defense costs and settlement for ISU, the costs and settlement would continue to accrue interest until the next appropriation (assuming the legislature approved the appropriation) costing the State and its tax payers additional monies. Therefore, the Court concludes that the State did make the payments under an obligation to protect the interests of the state and its citizens and did not make the payments as a mere volunteer.

We agree. The State did not pay ISU's debt to the Hales as a mere volunteer, but because it had a "recognizable interest to protect", and a "practical compulsion to pay." *Chenery,* 115 Idaho at 285–86, 766 P.2d at 755–56. Thus, we hold that the district court did not err in concluding that the State was entitled, under *Chenery,* to equitable subrogation against Continental.

2. *Whether the State acted as ISU's insurer in paying the Hale settlement, which would allow Continental to avoid liability under the "other insurance" provision of Continental's policy.*

 Subsection IV(b) of Continental's policy contains the following provisions regarding "other insurance":

(b) The Insurer shall not be liable to make any payment for loss in connection with any claim against the Assureds.

(1) *which is insured by another valid policy* or policies except as provided in (4);

. . . .

(4) for false arrest, libel, slander, defamation of character, invasion of privacy, wrongful eviction, assault or battery, except insofar as may be insured under any other valid policy or policies and then only in excess of such insurance.

(Emphasis added). Continental claims that the State acted as ISU's insurer when it paid ISU's losses on the Hale lawsuit, and therefore, under the "other insurance" provision in Continental's policy, Continental is not liable to pay for those losses. The State contends

that its payment to the Hales out of the BRM's retained risk account was not insurance coverage for ISU, but "self-insurance" for the State. Self-insurance is the popular name of what is more accurately known as "risk retention." Self-insurance occurs when an entity, rather than purchasing insurance to cover potential losses, elects to pay off its losses as they arise, or to set aside fixed sums into a reserve account to pay off intermittent losses. *Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297, 1300 (9th Cir. 1987).[1] The nature of "self-insurance", and the fact that it is not a form of insurance, is well-established.

> Risk transference or risk distribution may be accomplished without using insurance. If one entity, such as a corporation or a governmental agency, engages in a sufficient volume of ventures of a given type, the risks of all the ventures in the group can be spread by the enterprise acting on its own. For example, entities that provide goods or services to many individuals (such as a municipally owned utility with hundreds of customers, or a bus or an airline company with thousands of passengers) could choose to handle the risk of personal injury claims by "setting aside" assets—either by accounting entries or by actually establishing a special fund—from which it will pay such claims, rather than by purchasing insurance.... Although an entity that handles the risk of tort claims in this manner is sometimes referred to as a "self-insurer," this approach involves no insurance as the term is ordinarily used in regulatory statutes or in other legal contexts.

ROBERT E. KEETON & ALAN I. WIDISS, INSURANCE LAW § 1.3(b)(3) (1988). The essence of an insurance contract is the shifting of the risk of loss from the insured to the insurer. *Helvering v. Le Gierse*, 312 U.S. 531, 539, 61 S.Ct. 646, 649, 85 L.Ed. 996 (1941); *Clougherty*, 811 F.2d at 1300. Because "self-insur-

ance" does not involve a transfer of the risk of loss, but a retention of that risk, it is not insurance. If the State's payment of ISU's losses was a matter of "self-insurance", rather than insurance, it did not trigger the "other insurance" clause in Continental's policy. Thus, we must determine whether the State's payment of ISU's losses out of its retained risk account constituted "self-insurance", or real insurance.

■ To resolve this question, we must examine the relationship among the State, ISU and BRM to determine whether the State's retained risk program involved a transfer of the risk of loss from ISU to BRM, or the State. Although the Idaho legislature established ISU as "a body politic and corporate, with its own seal and having power to sue and be sued in its own name," I.C. § 33–3003, the Idaho Constitution requires that ISU's existence and operation be under the control of the state.[2] However, the focus of our inquiry is not so much on the legal-political relationship between ISU and the State, but on the economic relationship and the substance of the transaction between the State, ISU and BRM. *Carnation Co. v. Commissioner*, 640 F.2d 1010, 1013 (9th Cir. 1981) (in determining issue of "insurance" v. "retention", question is not status of the actors, but economic substance); *Clougherty*, 811 F.2d at 1305 (rather than legal status of entities involved, we examine economic consequences of captive insurance arrangement to "insured" party to see if that party has, in fact, shifted risk). In this regard, we note that ISU was "capitalized" from the general fund of the State of Idaho, and that the University is funded on an annual basis primarily by appropriations from the general fund of the State. It is the responsibility of the director of the State Department of Administration to assess the nature and extent of the risks of loss to which the various agencies of the State, including ISU, are exposed, and to determine whether to purchase insurance to cover those risks. I.C.

---

1. BLACK'S LAW DICTIONARY 1360 (6th ed. 1990), defines self-insurance as:

 The practice of setting aside a fund to meet losses instead of insuring against such through insurance.

2. Article XI, Section 2, of the Idaho Constitution states, "No charter of incorporation shall be granted, extended, changed or amended by special law, except for such municipal, charitable, educational, penal, or reformatory corporations as are or may be, under the control of the state; . . ."

§ 67–5773. Idaho Code § 67–5774 created the position of risk manager to assist the director in carrying out the State's risk management programs. The risk manager manages the Bureau of Risk Management. If the BRM determines that insurance and claim administration costs are disproportionately great in reference to certain risks, the BRM may determine not to procure insurance to cover those risks, but to manage those risks through a program of "retention" or "self-insurance." I.C. § 67–5775(1). The Legislature created a "retained risk account" in the asset fund in the state treasury to pay premiums for insurance purchased, to pay the costs of operating the division of insurance management, and to establish reserves to pay the losses on those retained risks for which no insurance is purchased. I.C. § 67–5776. The BRM charges each state agency for its reasonably apportioned share of the cost of administering the risk management program, including administrative costs, the cost of insurance, and the costs of the retention program. I.C. § 67–5777. If any agency fails to remit its assessment to the risk management program as charged, the division of insurance management certifies the delinquency to the State Treasurer, and the State Auditor is required to pay the bill out of monies in the state treasury allocated to the delinquent agency. I.C. § 67–5778. If the delinquent agency lacks sufficient funds in its annual appropriation to pay the amount charged, the director of the Department of Administration "shall take any legal steps necessary to collect such amount" from the agency. *Id.*

These code sections make it clear that the State funds its risk management program through mandatory assessments to the various state agencies. The State, through the BRM, assesses the risk exposure of the various agencies, determines what risks to insure, negotiates the purchase of insurance, and charges the agencies proportionately to pay for the insurance and to fund a reserve account to pay for those losses which are not insured. Thus, at the same time the State funds its various agencies, it also requires those agencies to remit a portion of those state funds to the retained risk account to finance the State's risk management program. Because the State is ultimately liable for those uninsured losses incurred by agencies as a result of claims brought under the ITCA, the State is essentially requiring agencies to use their state appropriated money to fund a reserve account to pay losses for which the State is ultimately liable.

The facts of this case are somewhat analogous to those of the *Carnation* and *Clougherty* cases cited above. In *Carnation* and *Clougherty*, parent corporations purchased insurance from unrelated insurance companies. However, those insurance companies then reinsured the vast majority of the risk with wholly-owned subsidiaries of the parent companies. Thus, the subsidiaries were the insurers of the great majority of their parent corporations' risks. The parent corporations sought to deduct the insurance premiums paid from their taxes as ordinary and necessary business expenses. While premiums paid for insurance are deductible as ordinary and necessary business expenses, *Carnation*, 640 F.2d at 1012, amounts set aside for self-insurance are not deductible. *Id.* at 1013. Thus, when companies elect to self-insure, they cannot deduct the amounts paid into their retained risk account, only the amount actually paid out for losses. In both *Carnation* and *Clougherty*, the Ninth Circuit concluded that there was no economic shifting of risk between the parent corporations and their captive insurance subsidiaries, and therefore the "premiums" were not deductible as insurance. The Court used the "economic family" concept in *Clougherty* to conclude that there was no risk shifting, and therefore that the economic substance of the transaction was one of "self-insurance." The Court stated:

> [T]he insuring parent corporation and its domestic subsidiaries, and the wholly owned "insurance" subsidiary, though separate corporate entities, represent one economic family with the result that those who bear the ultimate economic burden of loss are the same persons who suffer the loss. . . . [Premiums] remain within the economic family and under the practical control of the respective parent in each situation. . . . [N]othing has occurred oth-

er than a movement of an asset (cash) within each family of related corporations. *Clougherty*, 811 F.2d at 1302.

We conclude that the economic family concept is applicable to the facts of this case. The State, ISU and BRM represent one "economic family." The State, in funding ISU, and requiring ISU to remit funds into the retained risk account, has done nothing other than move assets among separate members of the same economic family. It is actually the State who is funding the retained risk account, and it is the State which bears the ultimate economic burden of loss. The State required ISU, as well as its other agencies, to contribute to the retained risk account, out of funds appropriated to these agencies by the state legislature. The retained risk program and payments made thereto by ISU did not shift any risk of loss from ISU to the State. The State established and mandated agency participation in the retained risk program in order to create reserves from which the State could pay for losses for which the State would be ultimately liable.

Based on the facts and the law cited above, we conclude that the State's retained risk program, from which the Hale settlement was paid, did not constitute insurance for ISU, but "self-insurance" for the State. Therefore, the district court did not err in concluding that the "other insurance" clause in Continental's policy was not triggered by the State's payment of ISU's losses.

3. *Whether Continental is Entitled to a Set–Off Because Compass Already Paid the State $150,000 on the Hale Matter.*

▮▮▮ After negotiations, the State and Compass agreed that Compass would pay the State $150,000 under Compass's policy and the State would provide Compass with a release from further liability. The State subsequently used the money from Compass to reimburse ISU for defense expenses. Continental argues that the summary judgment granted by the district court gave the State a $150,000 windfall because it did not offset the judgment by the amount Compass had already paid to the State. Continental's argument is incorrect because the district court did not award the State 100% of the settlement and defense costs incurred in the Hale matter. The district court applied the *Lamb Weston* rule which this Court adopted in *Sloviaczek v. Estate of Puckett*, 98 Idaho 371, 565 P.2d 564 (1977), to disregard the competing "other insurance" clauses in the insurers' policies, and prorate the loss between the insurers in proportion to the amount of insurance provided by their respective policies. In *Sloviaczek*, this Court held:

> The effect of the *Lamb–Weston* doctrine is to disallow conflicting "other insurance" clauses. Upon disallowance a plaintiff is effectively covered by more than one insurance policy. He is therefore entitled to recover an amount equal to his loss up to the combined limits of all of the policies. In the event his losses are less than the combined limits of all the policies, they should be allocated pro rata in proportion to the amount of insurance provided by the respective policies.

*Sloviaczek*, 98 Idaho at 375, 565 P.2d at 568. The district court correctly applied this rule by dividing the total amount of insurance provided by the two policies ($1,100,000) by the amount of insurance provided by each policy alone ($1,000,000 under the Continental policy, and $100,000 under the Compass policy), to conclude that Continental was liable for 90.9% of the loss, and Compass was liable for 9.1% of the loss.[3] Using this formula, the district court correctly concluded that of ISU's total losses in the Hale litigation ($809,141.29), Continental's proportion-

---

3. With respect to its final issue on appeal, Continental has argued that the liability limit on the Compass policy under the facts of this case was actually $200,000, because the policy states $100,000 per person and $300,000 per occurrence, and there were two plaintiff's in the Hale lawsuit. However, the record before us does not disclose that Margaret Hale alleged she suffered any injuries separate from those sustained by her husband, but rather that she, as a member of the marital community, was injured by the same injuries suffered by her husband. The record indicates that the Hales were suing as a marital community to recover for one set of injuries to the community. Hence, we conclude, as did the district court, that Compass's liability limit on the Hales' claim was $100,000.

ate share was $746,592.16. By using the same formula, Compass's proportionate share of the losses would have been $62,-549.13.

■ Because, before the settlement was reached in the Hale matter, Compass paid the State $150,000 in return for a release of liability, Compass actually paid $87,450.87 more than what its proportionate share would have been. Thus, if the State is awarded the full amount of Continental's proportionate liability, in addition to the $150,-000 it received from Compass, the State will receive $87,450.87 more than it paid to settle the Hale matter. If the State could recover against Continental on a contract theory, we might hold Continental liable for the full amount of its proportionate contractual liability. However, the State is seeking relief against Continental on equitable grounds. It has long been established that "[t]he doctrine of subrogation is not administered as a legal right but the principle is applied to subserve the ends of justice and to do equity." *Houghtelin v. Diehl*, 47 Idaho at 640, 277 P. at 700. Justice and equity are served only to the extent that an aggrieved party is returned to its rightful position. An equitable remedy should not be applied to allow a party to recover more than that which will make the party whole. The State is not entitled to recover more from Continental than what would restore the State to its position prior to paying for the Hale settlement. Accordingly, we hold that in order to prevent the State from recovering more than what it paid to satisfy ISU's debt, the judgment against Continental must be offset by the amount of Compass's payment which exceeded its proportionate liability, $87,450.87.

4. *Whether the Trial Court Erred in Granting Summary Judgment to Compass.*

■ Continental asserts that the district court should not have granted summary judgment to Compass because genuine issues exist whether Compass's payment of $150,-000 fully satisfied Compass's obligation under its policy. We conclude that the district court was correct in granting summary judgment to Compass against Continental. Com-

pass obtained from the State a valid release from liability as a result of its settlement agreement with the State. Even if the State granted Compass a release from liability for less than its proportionate share, the State, not Continental would be responsible for that deficiency. Continental's only obligation is to pay its proportionate share of the loss. Continental's liability was not joint and several with Compass's, so Continental could not be, nor has it been, held liable for any alleged deficiency with respect to Compass's payment to the State. Because the adequacy of Compass's payment to the State has no effect on Continental's rights or liabilities, Continental has no standing to challenge the sufficiency of Compass's payment to the State. "[T]o satisfy the case or controversy requirement of standing, litigants generally must allege or demonstrate an injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." *Miles v. Idaho Power Co.*, 116 Idaho 635, 641, 778 P.2d 757, 763 (1989). Because Continental has failed to demonstrate that the adequacy of Compass's payment to the State could cause Continental any injury, Continental lacks standing, and the district court did not err in granting summary judgment to Compass on Continental's third-party complaint.

## CONCLUSION

Because the State had a "practical compulsion" to settle ISU's liability to the Hales, we affirm the district court's conclusion that the State was entitled to equitable subrogation against Continental. We also uphold the district court's ruling that because the State's retained risk program did not constitute insurance for ISU, it did not trigger the "other insurance" clause in Continental's policy. We further hold that because the State is not entitled to recover in equity more than what will return the State to its rightful position, Continental is entitled to a set-off of $87,-450.87. Finally, we hold that Continental lacks standing to bring its third party complaint against Compass, and therefore the district court did not err in granting summary judgment to Compass on that claim.

Costs are awarded to the State under I.A.R. 40. No attorney fees are awarded on this appeal.

McDEVITT, C.J., and BISTLINE, JOHNSON and TROUT, JJ., concur.