685 P.2d 271

John SPANBAUER and Marie Span-
bauer, husband and wife, Plaintiff-re-
spondents and Cross Appellants,

v.

J.R. SIMPLOT COMPANY, a foreign cor-
poration; Food, Machinery & Chemical
Corporation, aka F.M.C. Corporation, a
foreign corporation; John Doe, Jane
Doe, John Smith and Jane Smith, Ficti-
tious individuals; and John Doe Corpo-
ration and Jane Doe Corporation, ficti-
tious foreign corporations, Defendant-
appellants and Cross Respondents.

No. 14705.

Supreme Court of Idaho.

Feb. 27, 1984.

Rehearing Denied Aug. 23, 1984.

Wesley F. Merrill, of Merrill & Merrill, Pocatello, for defendant-appellant and cross-respondent J.R. Simplot Company.

Louis F. Racine, Jr., of Racine, Olson, Nye, Cooper & Budge, Pocatello, for defendant-appellant and cross-respondent FMC Corp.

R. Max Whittier, of Whittier & Souza, Pocatello, for plaintiffs-respondents and cross-appellants Spanbauers.

BAKES, Justice.

This action was commenced to recover for injury to respondent Spanbauer's real property, and to a cow/calf operation conducted on the property, allegedly caused by the emission of fluorides from the appellants' phosphate plants. Appellants Simplot and FMC appeal from a judgment based on a jury verdict in favor of Spanbauer which granted $95,545 on the injury to property count, and Spanbauer cross appeals from the trial court's grant of a judgment n.o.v. on the claim of injury to the cattle operation for which the jury had awarded $13,526. We reverse the judgments challenged on both appeals and hold that there is a lack of substantial competent evidence to support the jury's verdict on the injury to property claim, and that the trial court erred in granting a judgment n.o.v. on the cattle operation claim.

Simplot and FMC operate separate phosphate plants in the Pocatello area. These plants emit fluorides as a byproduct of phosphate processing. In 1956, after the plants had already begun operation, Spanbauer purchased the land in question here. The Spanbauer family conducted a farming and cattle feeding operation on the land. A few years before 1976, the family began a cow/calf operation on the property. The evidence reflects that to conduct a successful cow/calf operation one must build up a herd by breeding the cattle, in an attempt to breed higher quality cattle for sale. Spanbauer used part of his land to keep and feed the cattle, while using the remainder of his property and many acres of leased property to raise hay and grain for feed.

In approximately 1976, Spanbauer noticed that many of his cattle appeared to be having problems in the development of their teeth and joints. He suspected that the problem stemmed from fluorosis, a disease which affects animals who ingest an overabundance of fluorides. He subsequently conducted tests on the foliage and bone analyses of animals raised on the property. These tests indicated the strong presence of fluorides. Spanbauer also noticed that his land, located at a distance of 2½ miles from the phospate plants, was often covered with dust and effluents originating at appellants' plants. Spanbauer suspected that the fluoride contamination on his land stemmed from these emissions.

From 1976 through subsequent years, Spanbauer's cattle continued to suffer from the effects of fluorosis. In 1980, Spanbauer determined that his cattle operation could not continue in the Pocatello area because of the fluorosis condition. He then moved to Jerome and commenced this action in October, 1980. At the time of trial, Spanbauer still owned 130 acres of the land in question, having failed in his efforts to sell it.

Spanbauer brought suit against FMC and Simplot, alleging damage to his land, loss of profits to his cow/calf operation, and claiming punitive damages. A great deal of the testimony at trial was devoted to proving or disproving the existence of fluorosis in Spanbauer's cattle. The question of liability of Simplot and FMC for the fluorosis contamination of defendant's land and cattle operation is not challenged on this appeal. The only questions presented deal with the problems posed by Spanbauer's alleged failure to prove the amount

of damages suffered with sufficient certainty.

I

 We will consider the appeal of Simplot and FMC first. They challenge the award for damages to the real property. Our task on appeal from a jury verdict is to determine if there was substantial, competent evidence to support the verdict. *Quincy v. Joint School Dist. No. 41, Benewah County,* 102 Idaho 764, 640 P.2d 304 (1981); *Stoddard v. Nelson,* 99 Idaho 293, 581 P.2d 339 (1978); *Werry v. Phillips Petroleum Co.,* 97 Idaho 130, 540 P.2d 792 (1975). In this case, the trial court refused to grant a judgment n.o.v. on this issue. The substantial evidence test also applies to an appeal from a denial of a motion for judgment n.o.v. *Mann v. Safeway Stores, Inc.,* 95 Idaho 732, 518 P.2d 1194 (1974). In reviewing the evidence, we must view it in a light most favorable to the respondent Spanbauer. *Higginson v. Westergard,* 100 Idaho 687, 604 P.2d 51 (1979); *Furness v. Park,* 98 Idaho 617, 570 P.2d 854 (1977); *Matter of Estate of Webber,* 97 Idaho 703, 551 P.2d 1339 (1976). Only when the findings of the trier of fact are clearly erroneous will the verdict be set aside. *See Massey-Ferguson Credit Corp. v. Peterson,* 102 Idaho 111, 626 P.2d 767 (1980); *State ex rel. Kidwell v. Master Distributers, Inc.,* 101 Idaho 447, 615 P.2d 116 (1980). *See also* I.R.C.P. 52(a). A finding of the trier of fact will be set aside only if there is no substantial evidence to support it. *See Wood v. Sadler,* 93 Idaho 552, 468 P.2d 42 (1970).

Only two people testified on the question of the measure of damages stemming from the injury to Spanbauer's land. One was Spanbauer himself. He testified that, based on his experience, in his opinion the value of his land *at the time of trial* would be $3,200 per acre if it were free from fluoride contamination.

"Q. BY MR. WHITTIER: Do you have an opinion as to what the value of your place would be if it was—did not have the fluoride contamination? This is your home place.

"A. Yes. I think it would have a value of $3,200 per acre."

He testified that he based this estimate not only on his experience, but also on the fact that adjoining land sold shortly before trial for $3,200 an acre. He then testified that the present value of his land *with fluoride contamination* was $275,000.[1] He explained that he had discounted the value of his land by one-third to account for the damage caused by fluoride contamination.

"Q. Would you tell us how you arrived at that.

"A. I figured a third of the value had it not been contaminated.

"Q. Well, maybe I misunderstand you. If it, if it was not contaminated—strike that. Explain your answer, what you mean by the one-third.

"A. If—it decreased in value by one-third.

"Q. Because of this condition?

"A. Because of this condition."

On cross examination, Spanbauer claimed that his one-third depreciation value was based on his experience.

"Q. Where did you get your one-third depreciation value?

"A. Based on my experience."

He also admitted on cross examination that the $3,200 an acre sale of adjoining property, upon which he partially based his estimate of the value of his land if undamaged, was made on an as-is basis, *i.e.,* the adjoining land was sold *with* fluoride contamination. However, there was testimony indicating that the sale was made to a church, and the existence or non-existence of fluor-

---

1. "Q. Now that you have been fully advised of what the nature of the contamination is, do you have an opinion as to what the present value is?

"A. I would have to refer to my notes on this if I may. You're asking me—

"Q. What the present value of the land is. Do you as the owner have an opinion as to what the present value of the land is knowing that it does have contamination of fluoride?

"A. I would say that the present value with fluoride is $275,000 total."

ide contamination was irrelevant to such a buyer.

The other person to testify on the amount of permanent damage caused by fluoride contamination was Charles Thompson, an area realtor. Viewing his testimony most favorably to Spanbauer, as we must, Thompson's testimony indicates that the land could no longer be used for a cow/calf operation. Thompson admitted that there was some damage to the land and estimated it to be between 0% and 10%. Thompson also testified of the existence of various comparable sales within the area. These comparable sales, which Thompson testified had to be adjusted either up or down to compare to Spanbauer's property, depending on the condition of the land itself, ranged in price from $1,500 an acre to $6,000 an acre.

Appellants present numerous reasons why the testimony presented does not support the jury verdict. Initially we note that there is no issue raised concerning the trial court's ruling as to the applicable statute of limitations. The trial court applied I.C. § 5–224, a four-year statute of limitations, and instructed the jury that the plaintiff had to prove "a decrease in the fair market value of the plaintiff's land between October 27, 1976, and October 27, 1980 ...." Neither party challenges the application of I.C. § 5–224 to this case or the trial court's instructions. *See Woodland v. Lyon,* 78 Idaho 79, 298 P.2d 380 (1956).

The measure of damages recoverable for permanent injury to land is the diminution in market value of the land. This rule is often stated as the difference in the market value of the land before the injury, and the market value of the land after the injury. *See Smith v. Big Lost River Irr. Dist.,* 83 Idaho 374, 364 P.2d 146 (1961). Because of the application of the four-year statute of limitations, Spanbauer was required to prove what damage had occurred to his land between October, 1976, and October, 1980, and also that the market value of his land diminished during this same period. In this respect, there was a complete failure of proof. Spanbauer's testimony dealt only with the value of his property, *at the time of trial,* with and without contamination. There was an absence of testimony concerning the value of the land before the contamination. The testimony was that the contamination had begun some thirty years before trial of this case. Since the contamination of Spanbauer's land began before October, 1976, it would not have been possible for Spanbauer to attempt to prove the value of the land before *any* contamination because to do so would allow him to recover for all damage incurred without regard to the four-year statute of limitations. To recover for his injury, Spanbauer was required to prove the value of the property at the beginning of the limitation period, before the damage done *within that period* occurred, so that a comparison could be made between the market value of the land before the compensable damage began and the value of the land after the compensable damage occurred. Spanbauer totally failed to enter any proof into the record of the market value of his land at or near the beginning of the limitations period. Instead, Spanbauer testified to the present value of his land, with and without the fluoride damage. Use of such a formula would be improper, not only because it is not the correct measure of damage for permanent injury to land, but also because it would allow Spanbauer to recover damages for a longer period than allowed under the statute of limitations. Because there was a total lack of proof that could support an award under the proper measure of damages, the verdict in favor of Spanbauer on the cause of action for injury to land must be reversed.

II

We now consider whether the trial court was correct in granting a judgment n.o.v. on the question of the amount of damage to the cattle operation. Spanbauer was the only witness on this issue. On direct examination, he testified that he suffered damages from losses due to the death and sale of cows, or purchase of replacement cows;

46

and for losses from calves that did not reach a sufficient weight and consequently were sold for a less than average price. Spanbauer testified to the average price normally received for a cow or calf, the average price he received, and the average weight that calves normally reach. On cross examination, counsel for defendants inquired about the existence of records of any overhead expenses incurred during the years he suffered cattle losses to support defendants' theory that, since plaintiff was seeking recovery for loss of profits to an ongoing business, he had to show overhead expenses because only a net amount of profit can be recovered. At the end of the trial, the trial court refused to grant directed verdicts on the damages claims. The jury then returned a verdict awarding $95,-545 for damage to the land and $13,526 for damage to the cattle operation. Simplot and FMC then moved for a judgment n.o.v. on both of the damage claims. The trial judge granted a j.n.o.v. only on the cattle operation claim, noting the lack of proof of overhead expenses. Spanbauer has cross appealed the grant of j.n.o.v. on the cattle operation claim.

 All of the testimony presented at trial concerning damage to Spanbauer's cattle was phrased in terms of the market value of those cows. There was testimony on the market value of the cows sold in 1979, and the market value they had before the fluorosis damage occurred. The same evidence was presented for cows which had to be replaced in 1980. Examples of the type of testimony presented include:

"Q. BY MR. WHITTIER: Okay. You said you sold 12 cows [in 1979]. What was the average selling price for those cows?

"A. Four hundred fifty dollars per head.

"Q. And what was the market—what were the costs of replacing a cow of similar age and for the similar purpose and quality that these cows would have been had they not been afflicted by these symptoms that you spoke of?

"A. Five hundred thirty-seven dollars and fifty cents.

. . . .

"Q. And for the cows that died, do you have an opinion as to what the value of these cows would have been had they not been afflicted with this condition that you have described?

"A. They would have been worth that same replacement value.

"Q. How much?

"A. Five hundred thirty-seven dollars and fifty cents."

This testimony constituted evidence of the market value of the cattle before and after the damage caused by the defendants. As such, it would be sufficient to support at least some verdict for the plaintiff for damages to his personal property, the cattle. Insofar as damage to the cattle itself is concerned, this case was not one involving a claim of lost anticipated profits, such as those cited by Simplot and FMC. See *Pacific Northwest Bell Telephone Co. v. Rivers*, 88 Idaho 240, 398 P.2d 63 (1964) (claim for loss of profits due to alleged improper use of corporate name); *Williams v. Bone*, 74 Idaho 185, 259 P.2d 810 (1953) (claim for loss of anticipated profits because of defendant's wrongful removal of advertising sign). Instead, the circumstances in this case more closely resemble those cases which deal with direct damage to the assets of a business or the personal property of the owner. *C.C. Anderson Stores Co. v. Boise Water Corp.*, 84 Idaho 355, 372 P.2d 752 (1962) (claim for water damage to inventory stored in basement). Normally, the measure of damage used in these situations, where the merchandise cannot be repaired or restored to original condition by renovation or repair, is the difference between the market value before the injury and the market value after the injury. *See C.C. Anderson Stores Co. v. Boise Water Corp., supra.* In this case, that difference in market value of his cattle is what Spanbauer was attempting to prove at trial, and the jury could properly have awarded him that damage if it had been properly instructed on the issue. In a situation such

as this, where there is substantial competent evidence in the record to support the verdict of the jury, we normally could merely affirm that jury verdict.

 However, a problem is posed in this case due to the fact that the trial court failed to instruct the jury on the proper measure of damages to the cattle. Instead, the trial court instructed the jury that the plaintiff was required to prove gross income minus overhead expenses. It is clear from the record that the plaintiff did not prove this. However, that is not what he was required to prove in order to recover for damage to the cattle. It is also clear from the record that the plaintiff requested an instruction, numbered 9, which reads in part:

> "In ascertaining damages, you should consider:
> "1. any loss or damage to cattle raised on the property measured by the value of the cattle lost ...."

This is an instruction which approximates that which would be given in a case such as this where the plaintiff is attempting to recover for damage to personal property. It is also clear that the plaintiff objected to the trial court's failure to give this instruction. The following is an exerpt from the instructional conference:

> "Mr. McCoy: I feel that our Instruction No. 9 should be inserted, which covers loss or damage to the cattle raised on the property measured by the value lost ....
> "THE COURT: I'm going to overrule your request on that."

Because requested instruction number 9 represented a proper measure of damages to be used for damage to the cattle, it should have been given to the jury. To refuse to give this instruction was error. Because this error was prejudicial to the plaintiff, a new trial must be granted on this issue.

Spanbauers also urge that if this cause is reversed for a new trial we also consider whether the trial court erred in disallowing Spanbauers' alleged claim of punitive damages. We see no error in the trial court's handling of that issue. *Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 665 P.2d 661 (1983).

Judgment on the claim for injury to real property is reversed. Judgment n.o.v. on the claim for injury to the cattle is also reversed. The cause is remanded to enter judgment for Simplot and FMC on the first count, and for a new trial on the latter count.

No costs or attorney fees are awarded on appeal.

DONALDSON, C.J., SHEPARD and BISTLINE, JJ., and McFADDEN, J., pro tem., concur.