747 P.2d 1288

**Thomas F. HALE and Margaret S. Hale, husband and wife, Plaintiffs-Respondents-Cross Appellants,**

v.

**Mary Ellen WALSH and Robert V. Edington, Defendants-Appellants-Cross Respondents.**

No. 14927.

Court of Appeals of Idaho.

July 28, 1987.

As Modified on Denial of Rehearing Nov. 3, 1987.

Petition for Review Denied Dec. 9, 1987.

Herman J. McDevitt (argued), of McDevitt, McDevitt & Meyers, Pocatello and Daniel P. McKernan, Blackfoot, for defendants-appellants-cross respondents.

Michael D. Crapo, of Holden, Kidwell, Hahn & Crapo, Idaho Falls, for plaintiffs-respondents-cross appellants.

UPON REHEARING, THE OPINION OF THE COURT ISSUED MAY 6, 1986, IS HEREBY WITHDRAWN.

THIS OPINION IS SUBSTITUTED.

SWANSTROM, Judge.

Thomas and Margaret Hale sought equitable relief and damages against officials of Idaho State University (ISU) under 42 U.S.C. § 1983 after Thomas Hale's employment as a teacher was terminated. The Hales claimed that he had been "fired" for exercising his constitutional right of freedom of speech and association. After a trial, the jury found Robert Edington (Dean of the College of Liberal Arts) and ISU Assistant Vice President Walsh had deprived Hale of his first amendment rights of free speech and association. The Hales were awarded $100,000 in compensatory damages. Hale then moved for reinstatement at ISU and for an award of attorney fees under 42 U.S.C. § 1988. The district court declined to grant either remedy. Likewise, the district court denied motions by defendants Walsh and Edington for a judgment notwithstanding the verdict (n.o.v.) or for a new trial. Walsh and Edington appeal, contending that the court erred in denying these motions. They ask this Court to decide whether the jury instruction, defining constitutionally protected speech, was a correct interpretation of the law. Second, appellants question whether substantial and competent evi-

dence supports the jury's verdict. By cross-appeal, Hale raises three more issues: whether the court erred in granting a motion for a directed verdict in favor of ISU President Coulter at the close of the evidence; whether Hale was entitled by federal law to reinstatement at ISU; and whether he was entitled to an award of attorney fees under 42 U.S.C. § 1988.

For reasons hereinafter stated, we affirm in part. We vacate the order denying appellants' motions for a judgment n.o.v. or for a new trial. We vacate the order denying Hale's request for reinstatement and the order denying Hale an award of attorney fees under 42 U.S.C. § 1988. We remand the case to the district court for reconsideration of the damages, reinstatement and attorney fees.

The case is one of first impression in Idaho. We will begin by first noting the undisputed facts established at trial. Hale was hired to chair the history department and serve as a faculty member in the College of Liberal Arts at ISU in 1977. Hale was employed under a series of one-year contracts as an untenured faculty member. An ISU faculty member had to serve five years before tenure consideration. After two years, Hale was evaluated favorably as a faculty member, and in 1980 he was reappointed to serve another three-year term as chairman of the history department, subject to the pleasure of the Dean of the College of Liberal Arts, Dean Edington. However, in 1981, after serving only one additional year as chairman of the history department, Hale was given a one-year "terminal contract" which ended his employment at ISU on June 30, 1982.[1] Hale brought suit against Assistant Vice President Walsh, Dean Edington, President Coulter, the Idaho State Board of Education and its individual members for com-

pensatory and punitive damages under 42 U.S.C. § 1983. The board members in their individual capacity were summarily dismissed; however, Hale was allowed to proceed against board members in their corporate capacity. In light of *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the punitive damage claim was dismissed with prejudice against the board. Punitive damage claims against Assistant Vice President Walsh, Dean Edington and President Coulter were dismissed pursuant to a stipulation between the parties. President Coulter was dismissed from the suit at the close of the trial.[2]

## CONSTITUTIONALLY PROTECTED SPEECH

The crux of Hale's claim was that officials at ISU had deprived him of his constitutionally protected right of speech and/or association. At trial Hale argued there were three incidents where he engaged in constitutionally protected speech which were the cause of his termination. First, early in 1980, Hale became embroiled in a dispute known as the "Brigham affair." This dispute centered on whether a student (Brigham) could substitute a previously taken class in lieu of a seminar requirement needed for a social science degree. The college catalog required waivers to be approved by the chairman of the department. The student's petition for waiver was originally denied by Hale. In his denial letter, Hale set forth thirteen reasons for his position.

The student appealed the decision to Assistant Vice President of Academic Affairs, Walsh, who recommended a method be established to allow the course waiver. An unwritten agreement was entered into

---

**1.** Generally, non-tenured faculty who are given a terminal contract are not entitled to a hearing or a statement of the reasons for the action. An exception is provided in the faculty handbook, however, where the affected faculty member submits written factual allegations to the Board of Education that the decision to terminate was based on the employee's exercise of rights guar-

anteed by the constitution of this state or of the United States and a hearing is requested.

**2.** The board and its members were not named in the judgment and no liability was assessed against them. Therefore, they are not parties to this appeal.

whereby the student would submit a paper in lieu of the seminar requirement. The agreement was terminated by Hale when he questioned the originality of the student's paper. A new appeal was brought. Upon review by Dean Edington a new written agreement was entered into requiring a paper. The agreement was terminated by Hale when the student failed to turn in all books and note cards used in drafting his paper as required by Hale. At this time Dean Edington agreed with Hale's decision not to allow the waiver. The student again appealed and a special meeting was held whereby the student, Hale, Dean Edington and Dr. Kegel[3] met and discussed the matter. At the direction of Edington and Kegel the agreement was reinstated and Hale appealed the decision to ISU's judicial board and to the President of ISU. Throughout this affair, Hale contended the student was receiving special treatment because he was the son-in-law of a Dean Emeritus at ISU.

The matter remained dormant while Hale took a trip to London in the summer of 1980. Upon his return from London, however, Hale wrote a new letter to the President of ISU and asked him to review the situation and to reinstate Hale's original decision not to allow the waiver. Hale alleged that this so-called "petition letter" prompted Dean Edington to immediately suspend Hale as chairman of the history department. However, the matter was resolved before the suspension became effective and Hale's "petition" was dropped. No further action was taken to suspend Hale as department chairman. After the incident Dean Edington wrote a letter to Hale stating: "Let me assure you here, as I have in conversations with you, that nothing that has transpired in this case will in any way affect my sincere respect for you as a person and a professional, nor will it jeopardize in any way my consideration of your candidacy for tenure or promotion."

The second incident, which Hale contends involved constitutionally protected speech,

occurred after Hale became president of the ISU chapter of the American Federation of Teachers (AFT). In February of 1981, Governor Evans was to visit the campus. A disagreement surfaced between Hale and President Coulter over who had invited the governor to ISU. Both parties claimed credit for the invitation. The matter came to a head when Hale issued a press release through the University News Service emphasizing AFT's involvement in bringing Governor Evans to ISU. President Coulter immediately superseded Hale's news release by issuing a revised news release giving Coulter credit for the governor's visit to ISU.

The third incident occurred one day before Hale was notified of his termination, when a local newspaper article quoted Hale's comments which were critical of administration policy in handling ISU's financial crisis. Finally, as an example of the "administration's" attitude toward him, Hale introduced evidence involving use of the campus mail system. After Hale received notice that he was being given a "terminal contract," his chapter of AFT sought to establish a fund for Hale's legal expenses in connection with his termination. The AFT prepared a circular to solicit funds. However, the circular which was placed in the campus mail, without postage, was removed from the mailboxes because someone in the administration claimed it was "political."

In response to Hale's allegations, appellants denied he was fired because of any constitutionally protected speech. They alleged instead he was given a terminal contract of employment because of a poor evaluation on his application for promotion to the rank of associate professor. The "Promotion Consideration Committee" investigating Hale recommended he be "considered" for promotion. The committee rated him as "strong" with "reservations." Reservations included his inability to communicate and work well with students and other faculty members in the department.

3.  Dr. Kegel was then serving as Academic Vice President of ISU.

Hale's response to the committee report was: "This report is going to get me fired."

The appellants also contended that Hale harassed students, similar to his behavior in the "Brigham affair," which they felt was unreasonable and unprofessional. Therefore, appellants have insisted that their reasons for terminating Hale were for professional, not personal, reasons. In addition, they argued there was evidence to show that Hale took an active role in the local AFT chapter with the idea that he would have a pulpit to criticize the administration at ISU without fear of retaliation. If retaliation were to occur he would claim "union involvement" as the reason.

Other conflicting evidence surfaced throughout the trial. Hale testified that Dean Edington told him he (Hale) was being terminated because of pressure from the administration. He also was told that Assistant Vice President Walsh did not like him and that he rocked the boat too early in his career at ISU. Dean Edington denied making such statements. In fact Dean Edington testified his decision not to rehire Hale was made before Hale's statement criticizing ISU's financial policies appeared in the newspaper. Assistant Vice President Walsh and Dean Edington both claimed they had no knowledge of the dispute involving the governor's visit to the campus. They also denied any involvement with the removal of the AFT flyer from the campus mail.

At the close of the trial, the district court gave instructions to the jury as to which of Hale's activities were constitutionally protected. The instructions read as follows:

### INSTRUCTION NO. 13

Evidence has been introduced at this trial that Plaintiff Thomas F. Hale engaged in certain activities as an employee of the State of Idaho, specifically as a teacher and History Department Chairman at Idaho State University, namely:

(a) His participation in the ISU Federation of the American Federation of Teachers, AFL–CIO Local 2438;

(b) His statements to the press regarding University practices and policies.

(c) The submission of any petition by [Hale] to have administrative supervisors review policy decisions.

Such activities are protected from infringement by any person acting under color of state law or regulation by the First Amendment to the United States Constitution.

### INSTRUCTION NO. 14

You are further instructed that not all speech is constitutionally protected speech. Statements which relate solely to the internal policies and procedures of a public institution, statements which are not publically [sic] disseminated and which are not intended for public dissemination, are not subject to constitutional protection. Therefore, statements and opinions expressed by the parties regarding what has been called the "[Brigham affair]" are not constitutionally protected or privileged.

Appellants' counsel did not object at the jury instruction conference to the instructions to be given; however, Hale's counsel did. To no avail, Hale's counsel objected to the exclusion of the Brigham affair from constitutionally protected speech. Counsel did persuade the court to add subsection (c) to instruction No. 13, concerning Hale's petition letter to President Coulter seeking review of the Brigham affair. On appeal appellants claim the instructions were erroneous because some activities outlined in jury instruction No. 13, especially the petition letter, are not constitutionally protected.

█ In briefs submitted in this appeal the Hales have argued that appellants' failure to timely object to jury instructions preclude our review of the correctness of

those instructions.[4] Since the briefs were prepared, the Idaho Supreme Court released its opinion in *Country Insurance Company v. Agricultural Development, Inc.*, 107 Idaho 961, 695 P.2d 346 (1984). *Country Insurance* interprets Rule 51(a), I.R.C.P., as not requiring "the making of objections as a condition precedent to assigning error." *Id.* at 963, 695 P.2d at 348.

Although the Hales have suggested cogent reasons and circumstances here for not applying the *Country Insurance sub silentio* rule, we feel constrained to follow it. "The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers*, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983). We will, therefore, make our own independent judgment of whether the statements in issue and the circumstances under which they are made are protected by the first amendment. *Jacobellis v. Ohio*, 378 U.S. 184, 189–90, 84 S.Ct. 1676, 1678–79, 12 L.Ed.2d 793 (1964). *See Connick v. Myers, supra.*

Freedom of speech, while constitutionally guaranteed, is not absolute. Speech concerning public issues occupies the " 'highest rung of the heirarchy [sic] of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. at 145, 103 S.Ct. at 1689 (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982)). *See also McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir. 1983). Therefore, when a public employee engages in speech, which may be of public concern, a careful analysis of its content must be made. A tension exists between the employee's right to speak out on matters of public concern and the employer's responsibility to promote efficiency in public services and maintain harmony and discipline in employment conditions.

The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). *See also Allen v. Lewis-Clark State College*, 105 Idaho 447, 670 P.2d 854 (1983). It is no surprise the two interests clash creating conflicts between the employee and employer. Such was the case in *Connick v. Myers, supra*. In *Connick*, an assistant district attorney (Myers) was dismissed for insubordination after circulating a questionnaire concerning internal office policy. The questionnaire asked for responses with staff members' views on transfer policies, office morale, the need for a grievance committee, the level of confidence in superiors and whether employees felt pressured to work on political campaigns.

The Supreme Court announced that two inquiries must be made to determine whether a public employee's speech embraced matters of public concern to an extent deserving of first amendment protection. The first is whether the speech is of public concern. Content, form and context of the statements must be examined as revealed by the record.

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

*Connick v. Myers*, 461 U.S. at 146, 103 S.Ct. at 1690. Once the speech is found to

4. In appellants' motion for a new trial, errors in the jury instructions were raised. Jury Instruction No. 14 was objected to because the instruction failed to adequately explain what activities of Hale were *not* constitutionally protected. Appellants complained that only the Brigham affair was mentioned, while disputes involving

other students were not included. This is not the same argument made on appeal. Appellants now assert that the petition letter was merely a continuation of Hale's personal vendetta in the Brigham affair and was not constitutionally protected speech.

be of public concern a balancing test enunciated in *Pickering v. Board of Education, supra,* applies.

The employee has the burden to prove the constitutionally protected speech was the substantial and motivating factor for the termination. However, despite such proof, if the employer could show that, irrespective of the protected conduct the employee engaged in, the employer still would have taken the action it did, then the decision to terminate the employee will be upheld. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Also, even though the forum through which the employee chooses to engage in such speech may be private in nature, the speech is still constitutionally protected. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

In *Connick,* the trial court held the questionnaire circulated by the employee in the office to other employees to be constitutionally protected. However, the Supreme Court reversed. The Court held that, with the exception of the one question asking if employees felt pressured to work on political campaigns, the questionnaire did not deal with matters of public concern. It merely expressed one employee's dissatisfaction with internal office policies; therefore, matters of public concern were not raised. Such a finding ended any further discussion of those matters not of public concern. As to the question of political campaigns, the Court applied the balancing factors outlined in *Pickering.* The Supreme Court concluded:

> Myers' questionnaire touched upon matters of public concern in only a most limited sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Myers' discharge therefore did not offend the First Amendment.

*Connick v. Myers,* 461 U.S. at 154, 103 S.Ct. at 1693.

■ From our discussion to follow, we will first isolate an incident which we agree did not involve constitutionally protected speech or activity. That concerned an administrative decision to deny free use of the campus mailing system for distribution of the AFT fund raising circular. Appellants allege that the court erred in allowing evidence of the removal of the flyers to go to the jury because such use of the mailing system was not a constitutionally protected speech or activity. Appellants cite *Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The *Perry* case was not decided until after the trial in the present case. Even so, we hold that the judge's decision to admit evidence of the incident was not inconsistent with *Perry.*

Here, the trial judge did *not* instruct the jury that use of the campus mailing system by AFT to solicit funds for Hale was an activity protected by the first amendment. In fact, as the trial court was well aware, the solicitation effort came *after* Hale was issued a terminal contract. The incident was offered by Hale as evidence purporting to establish the animosity that President Coulter and appellants held toward Hale. Motivation for Hale's dismissal was an important issue for the jury to determine. *See, e.g., Peacock v. Duval,* 694 F.2d 644 (9th Cir.1982). Here, the circumstantial evidence linking the mailing suppression incident to either of the appellants in this case was weak, to say the least. The link was somewhat stronger to President Coulter. The weight to be given such circumstantial evidence was for the jury to determine. The evidence was relevant, at least as to defendant Coulter, and we do not believe that reversible error has been shown in admitting it.

■ We will now turn our attention to the activity which *was* held to be constitu-

tionally protected. According to *Pickering* and *Connick* our first inquiry must be to determine if the AFT activities of Hale, his speech to the press and his petition letter to ISU President Coulter involve issues of public concern. Certainly, we have no difficulty in concurring with the district court's conclusion that Hale's legitimate union activities are protected matters of public concern. We likewise readily agree that Hale's speech to the press critical of administrative financial policies involves matters of public concern. Indeed, on these two points, there is little argument to the contrary. However, greater difficulties arise from the Brigham affair.

It cannot be doubted that the Brigham affair which we have outlined at length was the core of the controversy between Hale and other administrators, including appellants. Obviously, it mainly involved an internal dispute as to who had authority to approve class waivers. Depending upon the point of view, it could be characterized as one man's determined crusade to see that special treatment of a student with "connections" would not bypass established scholastic requirements and procedures. From the other point of view, the affair can be seen as an unwarranted vendetta by a relentless department head against a student who had happened through no fault of his own, perhaps even with earlier guidance from faculty and administration, to miss taking a history seminar course required for his graduation. There was evidence that Hale doggedly pursued the matter, going to extreme lengths to prove his suspicions. It was undisputed that in the course of the dispute he confronted one dean in his office where he loudly and angrily berated the person within the hearing of other faculty in nearby offices.

After hearing the evidence, the trial judge determined that Hale's activities and speech in the Brigham dispute were not constitutionally protected under the first amendment. If Hale's conduct was to be held privileged in this case, the judge thought one could not find "any instance that wouldn't be constitutionally protected." The judge performed his own balancing test, asking "where do I segregate in this Brigham matter the statements that are, we'll say, privileged, and the acts and conduct of insubordination which went along with these statements and everything?" At the jury instruction conference the judge ultimately was persuaded that one particular effort by Hale to change the outcome of the Brigham dispute enjoyed the protection of the first amendment.

Hale went to London in the summer of 1980. The Brigham affair seemingly had been settled at the department level. However, when Hale returned to ISU in August, he renewed the controversy, escalating it to the highest level by writing a five-page so-called petition letter to ISU President Coulter. We must decide whether the trial judge was correct in instructing the jury that this activity was protected from infringement by the first amendment. It is a critical question in this case because there was evidence that this effort on Hale's part drew prompt retaliatory action by Dean Edington. Within days of receiving a copy of Hale's letter, Edington informed Hale he was being suspended as chairman of the history department. This suspension affected only administrative duties and authority, not Hale's classroom work.

Hale's petition letter asked President Coulter to reconsider the decision made by Dr. Kegel in regard to the Brigham affair. The letter requested a policy decision on departmental jurisdiction as to whether or not the Idaho State Board of Education regulation, set forth in the catalog, limited the approval of waivers to the departments. Such a policy would give Hale authority to decide whether or not a waiver would be granted. Such a decision would affect ISU's policy on waivers, not only pertaining to the Brigham affair, but would also be pertinent in other similar cases. The submission of a petition for administrative review of policy decisions appears to

relate to the right to a grievance procedure. "The functioning of a grievance procedure is generally an internal issue, important only to the teachers and School District employees who must use the procedure to air their complaints about employment conditions and practices." *Knapp v. Whitaker*, 757 F.2d 827, 841 (7th Cir.1985). However, Hale's letter concerned the application of an Idaho State Board of Education regulation requiring approval of a waiver by a "department and the appropriate dean of the college." *Compare, e.g., Peacock v. Duval, supra*, ("Because at least some of Peacock's words and writings concern questions of policy relating to the administration of a public medical school, his speech clearly transcends mere academic bickering."). The implementation of a state regulation is a matter of public concern since the regulation was promulgated by the state at the direction of the Legislature. Therefore, Hale's petition letter was a matter of public concern. We proceed to the required second analytical step—the *Pickering* balancing test.[5]

We have examined two areas under this test: the effect of Hale's activities on his teaching duties and on his duties as chairman of the history department. Hale's union activities were not detrimental to the working relationship of the parties. Nor were those activities detrimental to the employee-employer relationship. The discipline and morale in the classroom were not affected. Hale's published remarks concerning ISU's financial policies likewise pass scrutiny considering these factors. Undoubtedly, those remarks would be bound to displease certain administrators, including perhaps the highest, but not necessarily those with whom Hale was required to have a close working relationship. The content, form and context of the speech were appropriate, e.g., the University News Service, campus mail and the local newspaper. During this time period, Hale was recommended to be "considered" for promotion. These areas present no significant problems in this appeal.

Our main concern is the strain on the interpersonal relations because of the Brigham affair. Construing the evidence most favorable to Hale, it shows he was almost suspended from his position as chairman of the history department because of his letter to President Coulter. That letter, coupled with other examples of Hale's obstinance, or crusading spirit if you will, was bound to detract from the working relationship between Hale, as chairman of the history department, and other department heads. However, the dispute was seemingly resolved and assurances were made that the matter would in no way affect Hale's chance for promotion and tenure. In fact, six months passed before Hale was notified he would be employed for only one more year under a "terminal contract." Thus, we do not believe ISU's interest in efficiency, morale and discipline outweighed Hale's right to discuss matters of public concern.

---

5. As stated earlier, in *Pickering* the Supreme Court balanced the interest of "the teacher, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education, supra*, 391 U.S. at 568, 88 S.Ct. at 1734. Our own Supreme Court has noted that the following factors were considered in *Pickering* to balance those interests:

(1) Were the statements directed toward any person with whom the employee is in daily contact; (2) is there a question presented of maintaining either discipline by immediate superiors or harmony among co-workers; (3) would the allegations impede the proper performance of the employee's daily duties or interfere with the regular operation of the schools generally; (4) is the issue addressed a matter of legitimate public concern on which free and open debate is vital; and (5) were the matters addressed so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the employer's presumed greater access to the facts.

*Munch v. Board of Correction, State of Idaho*, 105 Idaho 53, 56 n. 6, 665 P.2d 1063, 1066 n. 6 (1983). *See* Note, *Connick v. Myers: Narrowing the Free Speech Right of Public Employees*, 33 CATH.U.L.REV. 429 (1984); Milbrath, *The Free Speech Rights of Public Employees: Balancing with the Home Field Advantage*, 20 IDAHO L.REV. 703, 712 (1984).

Accordingly, under the analysis formulated in *Pickering* and *Connick*, we conclude that Hale's union activities, his speech to the press regarding ISU's financial policies and his petition letter to President Coulter regarding ISU's policy on waivers were matters of public concern protected by the first amendment to the United States Constitution.

However, Hale cannot rest upon a showing that as a matter of law his conduct was constitutionally protected. He must also show his conduct was a "substantial ... or ... motivating factor" for appellants' action. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576. Here, the jury expressly found that the appellants discharged Hale from employment at ISU because he exercised his privilege of free speech and/or association as guaranteed by the first amendment of the United States Constitution. If, as we have determined, Hale's petition letter to President Coulter was constitutionally protected speech, then we are satisfied that there was sufficient competent evidence to support the finding of the jury. We now turn to the other issues.

## MOTIONS FOR JUDGMENT N.O.V. OR NEW TRIAL

■ Because motions for a judgment n.o.v. and a new trial were made, we must review the jury verdict using those review standards. A decision to deny a motion for a judgment n.o.v. will be upheld if substantial evidence supports the verdict of the jury. *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 518 P.2d 1194 (1974).

By substantial, it is not meant that the evidence need be uncontradicted. All that is required is that the evidence be of such sufficient quantity and probative value that reasonable minds *could* conclude that the verdict of the jury was proper. It is not necessary that the evidence be of such quantity or quality that reasonable minds *must* conclude, only that they *could* conclude. Therefore, if the evidence is so weak that reasonable minds could not reach the same conclusion the jury has, the motion for judgment n.o.v. is properly granted.

*Id.* at 736, 518 P.2d at 1198 (emphasis original). All adverse evidence is admitted as true along with every reasonable inference which may be legitimately drawn from it. *Id.* Here the record reveals the evidence is of a sufficient and probative value that reasonable minds *could* conclude the substantial and motivating factor for dismissal was based on constitutionally protected speech. We therefore uphold the trial court's denial of appellants' motion for judgment n.o.v.

On the motion for a new trial, the district court's decision will not be disturbed absent a manifest abuse of discretion. *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979); *Sheets v. Agro-West, Inc.*, 104 Idaho 880, 664 P.2d 787 (Ct.App.1983).

This standard has, as its foundation, the premise that the trial judge has had the opportunity to observe the parties, witnesses, and counsel during the trial and can better judge whether a fair trial was had and substantial justice was done.

*Sheets v. Agro-West, Inc.*, 104 Idaho at 883, 664 P.2d at 790. This standard is less rigorous than for a judgment n.o.v. *Id.* We hold the court did not abuse its discretion in denying the motion for a new trial.

However, once a plaintiff has demonstrated the speech was constitutionally protected and such speech was a substantial or motivating factor in the plaintiff's dismissal, the defendant is entitled to demonstrate "by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct." *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576. Appellants argue that sufficient evidence was presented to establish "the same decision would have been reached" regardless of Hale's constitutionally protected speech. Appellants claim they showed—by a preponderance of the evidence—that their recommen-

dation to offer Hale a terminal contract was based on the following conduct: a pattern of harassing students seeking his aid and guidance; disharmony within the history department; the detrimental effect on the working relationships between the Colleges of Liberal Arts and Education due to Hale's conduct with student and faculty; and, a weak department promotion committee report.

While the appellants presented evidence in support of these reasons, the evidence was rebutted. Hale presented evidence showing he was a good teacher and had a good relationship with students. Evidence was also presented showing an improvement in the harmony within the history department after Hale arrived. Hale also submitted proof he was the only faculty member recommended for a promotion who was not rehired.

> It is not our prerogative to invade the province of the jury in its weighing of the evidence and its determination of witness credibility. Because there exists a more than reasonable basis in the record to support a finding that [the employee's] constitutionally protected speech caused the defendants' actions, we uphold the jury verdict.

*Knapp v. Whitaker, supra* at 844–45. Here the jury was not persuaded that the appellants proved by a preponderance of the evidence that—absent Hale's constitutionally protected activity—he would not have been rehired. The verdict is supported by substantial and competent, albeit conflicting evidence. We will not disturb it. *Spanbauer v. J.R. Simplot Co.,* 107 Idaho 42, 685 P.2d 271 (1984). The district court's order denying appellants' motion for a judgment n.o.v. is affirmed. As we

discuss later, there is a need for the trial judge to reconsider the question of the excessiveness of the damages—one of the grounds raised in defendants' motion for a new trial. Accordingly, for that purpose, we vacate the order denying a new trial.

### REINSTATEMENT

■ We now turn to issues raised by respondents' cross-appeal.[6] Hale asserts that the district court erred in denying him reinstatement. A claim for reinstatement is established if the decision not to rehire an employee was made by reason of his exercise of constitutionally protected first amendment freedoms. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed. 2d 471 (1977). Once an employee establishes that his constitutionally protected conduct was a substantial and motivating factor in the employer's decision not to rehire, the employer must reinstate the employee unless it can show "that it would have reached the same decision ... even in the absence of the protected conduct." *Id.* at 287, 97 S.Ct. at 576. Reinstatement of the employee is therefore a basic element of an appropriate remedy in wrongful discharge situations and, except in extraordinary cases, is required. *Allen v. Autauga County Board of Education,* 685 F.2d 1302 (11th Cir.1982).

In denying Hale's motion for reinstatement the district court stated:

> The Court having considered the equities of the matter, concludes, after balancing the equities, that to reinstate the plaintiff would not be beneficial to either the plaintiff or to Idaho State University. That such reinstatement would only revive antagonism; cause further conflicts

**6.** Appellants contend Hale's amended notice of cross-appeal was not timely filed. This contention was originally raised by a motion to dismiss the amended notice of cross-appeal earlier in the proceedings. The motion was denied by order of the Supreme Court before the case was assigned to our court. Therefore, we will deem this issue to be settled.

Another issue raised in the cross-appeal we now deem to be moot. Hale asserted that the

district court erred in granting a directed verdict in favor of President Coulter. We were told at oral argument by Hale's counsel that this issue need be addressed only in the event the case is remanded for a new trial. Because we uphold the jury verdict and the resulting judgment so far as the damages are concerned, we believe this issue need not be considered further.

within the internal departmental affairs of the Department of History and foster further conflicts between the Department of History and other departments within the Liberal Arts. The Court further concludes that the monetary award made by the jury more than compensates the plaintiff for any damages he has suffered as a result of the jury's determination that there was misconduct on the part of the defendants.

The existence of antagonism between the parties, without some behavior which was unjustified or opprobrious, will not serve as an obstacle to reinstatement. *Id.; Professional Association of College Educators, TSTA/NEA v. El Paso County Community College District*, 730 F.2d 258 (5th Cir. 1984). "Relief is not restricted to that which will be pleasing and free of irritation." *Sterzing v. Fort Bend Independent School District, Fort Bend, Texas*, 496 F.2d 92, 93 (5th Cir.1974). "That reinstatement might have 'disturbing consequences,' ... 'revive old antagonisms,' ... or 'breed difficult working conditions,' ... usually is not enough, nor specific enough, to outweigh the important first amendment policies that reinstatement serves." *Professional Association of College Educators, TSTA/NEA v. El Paso County Community College District*, 730 F.2d at 269 (citations omitted).

Damages also cannot make the discharged employee whole. The wrongfully discharged employee has lost not only past earnings, but a job, which has provided the employee with such intangible benefits as status, reputation, and psychological benefits. "Reinstatement is also essential to deter retaliatory discharges and to eliminate the chilling effect such a discharge may exert on other employees whose desire to speak out against the ruling powers is stilled by fear of a similar fate." *Id.* at 276 (Rubin, J., dissenting). *See also Allen v. Autauga County Board of Education, supra.*

However, reinstatement may not be appropriate if it would "place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 285, 97 S.Ct. at 575. Therefore, at some point in time "the probable adverse consequences of reinstatement can weigh so heavily that they counsel the court against imposing this preferred remedy." *Professional Association of College Educators, TSTA/NEA v. El Paso County Community College District*, 730 F.2d at 269.

■ The district court gave two reasons for refusing reinstatement—the revival of old antagonisms and a jury award that "more than compensates the plaintiff for any damages he has suffered as a result of the jury's determination that there was misconduct on the part of defendants." The first does not weigh heavily against reinstatement. The second is problematic in this case. The court stated that the plaintiff received an award that "more than" compensated the plaintiff. If this was a determination that the monetary award of the jury exceeded the damages suffered by the plaintiff it would be a valid consideration in determining if there should be reinstatement. If there was an excessive award, reinstatement would place the plaintiff in a better position than he would have enjoyed had he not engaged in constitutionally protected conduct. However, if the award is not excessive, the award of adequate damages would not weigh heavily against reinstatement. The trial court's finding is not sufficient to make a determination on this issue. Moreover, the district court failed to make a finding as to whether Hale engaged in inappropriate and opprobrious conduct so that reinstatement would be inequitable. The court did say that reinstatement would "cause further conflicts within the internal departmental affairs of the Department of History and foster further conflicts between the Department of History and other departments within the Liberal Arts." This finding of the trial court—at least so far as it relates

to Hale's chairmanship of the history department—is supported by the record. For example, the unrebutted testimony of the Dean of the College of Education was to the effect that his department chairman and members of his faculty "would avoid, frankly, in any way that they could, having to deal with the Department of History, and with Dr. Hale specifically." Reinstatement could still be inappropriate, depending upon the court's findings as to the root causes for such anticipated future conflicts.

Moreover, it is our view that the trial judge should be free to consider separately the question of Hale's reinstatement as a member of the teaching faculty and as chairman of the history department. The two positions involve separate and distinct responsibilities. Each requires different characteristics, abilities, associations and working relationships. A person suitable to one position may be incapable of handling the other. Thus, we will not presume to dictate the outcome of this issue to the trial court.

### EXCESSIVE DAMAGES

■ The trial in this case was conducted just six months after Hale's final teaching contract ended. The jury awarded him $100,000 in compensatory damages at that time. As one of their grounds in the motions for judgment n.o.v. and for a new trial appellants asserted that the award was excessive and was the result of the passion and prejudice of the jury against the defendants. The court made no specific finding on this issue. However, the court disposed of several post-trial motions, including Hale's motion for reinstatement, in a single order. The court seems to couple its view of the damage award with the denial of reinstatement and with the denial of an award of attorney fees.

Thus, the court may have concluded that the damage award was not excessive in view of the fact that Hale would not be restored to his teaching position and would not receive an award of attorney fees. We do not necessarily hold that it was wrong for the trial court, when weighing the damages, to consider the presence or absence of equitable relief. *See, e.g., Knapp v. Whitaker, supra.* However, if this is what the trial court did, we have altered the balance by holding, *infra*, that Hale is entitled to a discreet award of attorney fees. We have also required reconsideration of the reinstatement issue. Therefore, in the absence of a more specific ruling by the trial court on the issue of the excessiveness of the damage award, we deem it necessary for the court to address this issue on remand. For this purpose we vacate the order denying the appellants' motion for judgment n.o.v. and for a new trial.

### ATTORNEY FEES

■ Finally, the Hales claim they are entitled to attorney fees under 42 U.S.C. § 1988 as a prevailing party in a 42 U.S.C. § 1983 action. The district court refused to award attorney fees because it concluded the appellants had not defended the case in bad faith. The Idaho Supreme Court recently held a prevailing party in a section 1983 action is ordinarily entitled to attorney fees under section 1988 "unless special circumstances exist that would make such an award unfair." *Shields v. Martin,* 109 Idaho 132, 141, 706 P.2d 21, 30 (1985). A prevailing party is one who succeeds "on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.* at 141, 706 P.2d at 30 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)). A finding that a party *defended* against a section 1983 action in bad faith is not required to award attorney fees to the prevailing party under section 1988. The fact that a party *litigates* in bad faith may be a basis for awarding costs and fees against that party in his individual capacity, apart from authority granted by section 1988. *See, e.g., Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Alyeska Pipeline Service Co. v. The Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

Here, the Hales are seeking fees under section 1988. They have made no real attempt to show that appellants have litigated this action in bad faith. The Hales have argued, however, that this court must, as a matter of law, hold that appellants acted "in bad faith" in terminating Hale's employment because of constitutionally protected speech and activity. The Hales cite *Wagle v. Murray*, 546 F.2d 1329 (9th Cir.1976), *vacated on other grounds*, 431 U.S. 935, 97 S.Ct. 2645, 53 L.Ed.2d 252 (1977), *remanded*, 560 F.2d 401 (9th Cir. 1977), for this proposition.[7] Because the factual and legal questions of whether appellants *acted* "in bad faith" were not determined in the trial court and are not germane to an award of fees under section 1988, we will make no ruling on this issue.

Because the trial court's reason for denying fees in this case was inadequate as a matter of law, we must remand with directions to reconsider the award of attorney fees. Fees should be awarded to the Hales under section 1988 "unless special circumstances exist that would make such an award unfair." *Shields v. Martin*, 109 Idaho at 141, 706 P.2d at 30.

We conclude the Hales were the prevailing party, as set forth in the standard outlined in *Shields*. We would deem this to be true even though damages might be reduced on remand, so long as a new trial is not required. The district court will determine the reasonable amount of any fees to which the Hales are entitled.

In *Hensley v. Eckerhart, supra*, the United States Supreme Court approved utilization of twelve factors to be considered in awarding reasonable attorney fees under section 1988. They are similar to criteria set forth in Rule 54(e)(3), I.R.C.P. *See also* Howard, *Attorney's Fees Under Civil Rights Litigation—An Evasive Standard*, 20 IDAHO L.REV. 635, 654–56 (1984). On remand, the trial court may look to the *Hensley* opinion for guidance on this issue. *See also Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

In conclusion, we have vacated the district court's order denying appellants' motions for judgment n.o.v. and a new trial, remanding for reconsideration of whether damages were excessive. We have also vacated the district court's order denying reinstatement as a remedy and denying an award of attorney fees under 42 U.S.C. § 1988. The case is remanded for further proceedings consistent with this opinion. Costs to respondents.

The Hales have requested attorney fees for this appeal under 42 U.S.C. § 1988. A prerequisite to an award under that section is that the party prevail. We presently view the Hales to be prevailing parties in this appeal. Although the Hales were successful, in part at least, the extent to which they prevail is yet to be determined in the remand to the trial court. "[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under [42 USCS § 1988]." *Hensley v. Eckerhart*, 461 U.S. at 440, 103 S.Ct. at 1943. If the Hales' status as prevailing parties remains unchanged after remand, the district court, in fixing the fee award, should include a reasonable fee for this appeal. *Paloukos v. Intermountain Chevrolet Company*, 99 Idaho 740, 588 P.2d 939 (1978).

WALTERS, C.J., and SCHROEDER, J. Pro Tem., concur.

---

7. The ruling in *Wagle* upon which the Hales rely turned on certain jury instructions given and a particular verdict form that was utilized without objection, as well as upon other factors which may not be present here. 546 F.2d at 1335 n. 18. Moreover, the Circuit Court of Appeals in *Wagle*—adopting language from *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), where violation of due process was at issue—held that Wagle's employers had knowingly violated Wagle's "clearly established constitutional rights." That premise can hardly be applied here. This case demonstrates, as well as any, that often there is not a "bright line" demarking speech and activity which is protected by the first amendment. The Brigham affair is the perfect example. To say that appellants should have been able to clearly distinguish Hale's protected activity from his unprotected activity is to attribute these school administrators with appellate court hindsight.